IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)

JUAN ANTONIO CANOURA,                                    CASE NO.: 1:19-cv-20883-RS

        Plaintiff,

vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, a foreign
corporation,

        Defendant.

_____/

## PLAINTIFF'S MOTION TO STRIKE
## DR. JEFFREY GELBLUM, M.D. AS AN EXPERT AND TO EXCLUUDE HIS REPORT
## & MEMORANDUM OF LAW

Plaintiff, JUAN ANTONIO CANOURA (Canoura), through undersigned counsel, and under Fed. R. Civ. Pro. Rules 47 and 702 and related case law and Fed. R. Evidence 403, files this Motion to Strike as an expert witness and strike all or portions of DR. JEFFREY GELBLUM'S COMPUULSORY MEDICAL EXAMINATION ("CME") Report and Strike or Limit Dr. Gelblum's testimony regarding causation of Canoura's stroke.   Plaintiff, JUAN ANTONIO CANOURA, in support states:

### I.      Procedural History.

This action commenced in January 2019 as an action for uninsured motorist benefits (Count I), Fla. Stat. §624.155 claim for bad faith (Count II) and Declaratory Judgment to Determine Liability and Total Amount of Damages (Count III). Since then undersigned counsel for Plaintiff has stipulated to dismiss count III and abate count II on the bad faith claim [D.E. 21].

The case arises from a motor vehicle rear end crash between the Plaintiff (Canoura) and Miguel Angel Cordero Illas ("negligent underinsured driver") that occurred on March 26, 2016. While driving a 1995 Ford Ranger truck at the intersection of State Road 25 (Ockeechobee Road) and N.W. 103 Street in Hialeah, Florida the negligent underinsured driver caused a vehicle collision with Plaintiff's vehicle, a Nissan Versa. Plaintiff suffered serious injuries to his head, neck, back, body and limbs because of the collision and a serious exacerbation of a spinal medical condition.

On or about April 11, 2017, the negligent uninsured driver's insurance company tendered their bodily injury liability limits to the Plaintiff; Defendant, State Farm was informed and agreed to waive subrogation, Thereafter, a demand was made for the Plaintiff's uninsured motorist limits. The Plaintiff's partial medical bills totaled over $80,000,00; the first layer of underinsured motorist coverage was for $100,000.00; Defendant State Farm denied paying the claim. Under Florida Statute §624.155 a Civil Remedy Notice was filed. After expiration of 60 days this lawsuit ensued. Plaintiff's medical bills now exceed $94,000 and include none of the treatment he received for his stroke which occurred approximately a year following the crash.

On May 20, 2019, Defendant State Farm filed its Motion for Defense Medical Examination of the Plaintiff with *orthopedist*, Rolando Garcia, M.D. [D.E. 11]. Undersigned counsel for the Plaintiff reminded State Farm counsel that Plaintiff's treating and testifying physician was *a Neurologist*, *not an orthopedist*, and Plaintiff did not intend to present orthopedic testimony. It was suggested that any Defense medical exam be done by someone in the same specialty as the Plaintiff's treating and testifying physician and counsel for State Farm was duly advised that undersigned counsel would not agree to a 2nd Defense Medical Exam if it later determined it would be seeking a neurological exam, as this would potentially force Plaintiff to retain another

2

physician to counter the Defense's two physicians to Plaintiff's one. This would not only work to prejudice the Plaintiff, but also work against the interests of trial efficiency and judicial economy. Defense refused to change its examining physician to a neurologist and undersigned counsel for Plaintiff agreed to allow the orthopedic exam to proceed without waiving Plaintiff's right to object to a 2nd examination from any specialist, including a neurologist.

On July 8, 2019, Plaintiff Canoura (who is elderly, a stroke victim and recently underwent cardiac surgery) under Court Order [D.E. 16], appeared for the Defense examination requested by State Farm with Defendant's selected orthopedist specialist, Dr. Rolando Garcia.

On July 17, 2019, without providing its report from Dr. Garcia[1], Defendant State Farm filed another motion requesting a second Rule 35 medical examination, this time with neurologist Dr. Jeff Gelblum [D.E. 35]. Despite Plaintiff's Response and Objection to this additional Medical Examination, this Court ordered the examination to go proceed [D.E. 16] Accordingly, Canoura appeared for his orthopedic Compulsory Medical Examination (DME) before Dr. Jeff Gelblum on September 25, 2019.

On September 13, 2019, Defendant served its Expert Witness List [D.E. 41] . As will be discussed below, the proposed testimony of Dr. Jeffrey Gelblum  is  duplicative and cumulative of the testimony and report of Defendant's other expert, Rolando Garcia. [D.E. 41]. Furthermore, Dr. Gelblum's proposed testimony regarding medical legal causation of the Plaintiff's stroke should be precluded because Plaintiff it does not serve to rebut any medical causation issues presented by

---

[1] This Court's Order [Docket Entry 16] required Defendant to deliver Dr. Garcia's report to Plaintiff by July 28th. The initial report and supplemental report were provided to Plaintiff's counsel well beyond the date ordered by the Court on August 15, 2019 and August 19, 2019 even though the report itself is dated July 8, 2019.

LAW OFFICES OF DIANA SANTA MARIA, P.A., University Place-Suite 205C, Ft. Lauderdale, FL 33328
Telephone: (954) 434-1077, Facsimile: (954) 434-4462

the Plaintiff as Plaintiff is not contending the subject crash "caused" the stroke, nor is he seeking recovery for damages caused by the stroke.

Lastly, Dr. Gelblum's report and his testimony on causation of the stroke or Canoura's predisposition to have a stroke is not relevant to the issues involving the aggravation of Plaintiff's spinal condition, nor does it assist the trier of fact under Rule 702 in any way,exept to confuse the issue. Obfuscation of issues is not the proper basis for allowing expert testimony.    Specifically, on page 5 of Dr. Gelblum's report he states that:

- "there is no plasuible causation between the accident in question in 2016 and the stroke, which occurred a year later in 2017…" and

- Canoura was "spontaneously predispose(d) to stroke at any time irrespective of trauma.:

(Please see Page 5 of Dr. Gelblum's report which is being filed under seal).

Plaintiff does not intend to introduce evidence showing that Canoura's crash caused his stroke. Rather, Plaintiff's expert neurologist, Dr. Nicholas Suite, will testify at trial (as he did repeatedly in his deposition) that he does not believe Canoura's 2016 accident caused his stroke; rather, it was his opinion that ***Canoura's previous spinal (low back) condition was aggravated by the subject crash, the pain and stress of which contributed to, but did not cause,Plaintiff's stroke.*** (Please see testimony of Dr. Suite, Pages 78:4-79:4, 83:19-85:18, 113:8-21 attached hereto as Exhibit "A"). As such, the testimony of Dr. Gelblum and his report is irrelevant. Plaintiff respectfully moves for entry of an Order prohibiting any trial testimony of Dr. Gelblum on the issues stated above and deeming inadmissible any portion of Dr. Gelblum's report.

## MEMORANDUM OF LAW

### A. The Testimony of  Dr. Jeff Gelblum Should be Excluded Because It Is Cumulative

## <u>and Duplicative of the Testimony of Dr. Rolando Garcia</u>

Rule 403 of the Federal Rules of Evidence permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."

In <u>Leffe v. Air Logistics, Inc.</u>, 876 F.2d 409, 411 (5th Cir. 1989), a case in which a laborer was involved in a helicopter accident resulting in serious injuries, including a ruptured bladder, fractures to his ribs, femur and pelvis, the U.S. Court of Appeals, Fifth Circuit, deferred to a trial court's order disallowing the testimony of plaintiff's second medical expert on the grounds that it would be repetitious and cumulative – although nor identical – to testimony already provided by plaintiff's first medical expert.  In *Leffe*, the court compared the testimony of Dr. Warren, who testified  regarding the Plaintiff's injuries, medical care and prognosis with counsel's proffer of the testimony of Dr. Russo, who was going to testify that "there [was] going to be an extreme possibility …that Leefe would develop arthritis" and he would "show the degree of disability as to this man because he rated this man."

The court stated:

> During trial, Leefe's attorney asked Dr. Warren whether he expected Leefe to suffer from arthritis in the future. Dr. Warren answered that "any time you injure a joint, then statistically you are subject to the possibility of what we call post-traumatic arthritis." Dr. Warren further testified that statistically he expected Leefe to develop arthritis in the future and that "[a]ny time ... [there is] an injury like this, then you would be concerned about the onset of an arthritis that could develop after injury." He also stated that "popping" in Leefe's right sacroiliac joint "made [him] wonder if this [was] not the early onset of some arthritic changes." Although Dr. Warren did not testify as to the exact odds that Leefe would develop arthritis, his testimony did address the likelihood that Leefe would develop arthritis.

<u>Id</u>. at 411.

**LAW OFFICES OF DIANA SANTA MARIA, P.A., University Place-Suite 205C, Ft. Lauderdale, FL 33328**
**Telephone: (954) 434-1077, Facsimile: (954) 434-4462**

Based on a comparison of the testimony of the two doctors, the court found that the lower court did not abuse its discretion in prohibiting Leefe from putting on further evidence concerning the probability that Leefe would develop arthritis. Id.

In Bowman v. General Motors Corp., 427 F. Supp. 234, the executor of an estate of a deceased passenger brought a products liability action against the manufacturer of the automobile. Following an extended jury trial, the jury returned a verdict for the defendant.  The executor moved for new trial and judgment notwithstanding the verdict.   The court excluded portions of the testimony of  expert, Alfred Baccini, as a rebuttal expert, in part, under Rule 403 and noted that allowing the additional expert would only have served the (party's) "tactical advantage: in allowing a "rerun of testimony already provided by (another expert)…" Id. at 239. The court also considered that "the trial reached the rebuttal stage only after 14 days of testimony" and noted that allowing the additional expert's cumulative rebuttal testimony, would have required the court to "grant rejoinder, thus needlessly prolonging an already long trial." Id. at 239-240.

Similarly, in Field v. Omaha Standard Inc., 583 F. Supp. 323, another products liability case, after judgement was entered for the manufacturer, plaintiff moved for judgement notwithstanding the verdict and for new trial arguing, in part, that the court unreasonably prejudiced his case by refusing to delay the trial to allow him to call his expert, Dr. Batterman, in rebuttal.  The District court observed:

> After hearing argument at side-bar, the (trial) Court concluded, *and plaintiff agreed,* that the substance of the evidence proffered had already been presented in plaintiff's case in chief by a different expert, Mr. Slagle. (Tr. 9–126). As such the evidence was excludable in the Court's discretion as unnecessarily cumulative.(citing *Bowman v. General Motors Corp.,* 427 F.Supp. 234 (E.D.Pa.1977).

6

Id. at 332.

Based on this and other evidence, the District Court denied both plaintiff's motion for judgement

notwithstanding the verdict and for new trial. Id. at 335.

Similarly, based on State Farm's expert disclosure and report of  Rolando Garcia

M.D.(orthopedist) and Jeff Gelblum, M.D. (neurologist) the testimony of Dr. Gelblum would be

duplicative and cumulative of the testimony of Dr. Garcia, would waste resources and time,

potentially forcing Plaintiff to present testimony from a 2nd expert  and needlessly prolong trial.

Specifically, Dr. Garcia at the end of his report states:

- *Juan Canoura did not sustain a permanent injury to the cervical spine or to the lumbar spine as a result of the 3/26/ 2016 accident.*
- *Canoura did not sustain a permanent aggravation of a preexisting cervical and lumbar degenerative condition as a result of the 3/26/2016 accident.*
- *No further treatment would be reasonable or necessary as it relates to the 3/26/2016 accident.*

[See D.E. 41 Pages, 16 and 18].

These are the same areas identified in the Defendant's designation of Dr. Gelblum:

> Dr. Gelblum is expected to testify regarding the neurological examination of the Plaintiff. **He shall address whether the Plaintiff suffered any injuries as a result of the subject accident, and future medical needs of the Plaintiff, if any. He is also expected to testify as to the reasonable necessity and relationship of medical expenses or lack thereof as to the subject accident**. It is expected that the basis of Dr. Gelblum's opinion will be on his examination of the Plaintiff, review of the medical records, diagnostic films and the years of experience, training and knowledge in this field.

[See D.E. 41 Page 2](Emphasis added).

Defendant should not be allowed to present cumulative and duplicative testimony on

these issues. The testimony of both State Farm's examining physicians  saying the same thing i.e,

that he suffered no permanent injury and that he needs no further care,  is unduly prejudicial to

the Plaintiff and should not be allowed.   Further, Defendant presenting duplicative experts will

needlessly prolong trial and work against the interests of judicial efficiency and economy of resources.

### B.  Under Federal Rule of Evidence 702, Dr. Gelblum's Testimony and Report Regarding Causation of Canoura's stroke and Canoura's Predisposition to have a Stroke Should be Excluded

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Fed. Rule Evid. 702.

Essentially, the witness must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact.

A major part of Dr. Gelblum's testimony and report goes to the issue of the medical causation between the March 2016 crash and his March 2017 stroke. Specifically, Dr. Gelblum is of the opinion that there is "no plausible causation between the accident in question in 2016 and the stroke, which occurred a year later in 2017…" and further, he has opined that Canoura is "spontaneously predispose(d) to stroke at any time irrespective of trauma." (Please see page 5 of Dr. Gelblum's report which will be submitted under seal under the section marked "Treatment"). This is ostensibly an effort to refute or rebut the testimony of Plaintiff's treating neurologist, Dr. Nicholas Suite, M.D. However, *Dr. Suite was very careful to explain in his deposition that he was not espousing the opinion that the crash caused the Plaintiff's stroke; rather, it was his opinion that Canoura's preexisting spinal condition was aggravated by the crash, the stress of which "contributed to, but did not cause", his stroke.* (Please see Relevant portions of Dr.

Nicholas Suite, M.D.'s deposition, pages 78:4-79:4, 83:19-85:18 and 113:8-21 attached hereto as

Exhibit A). As such, the testimony of Dr. Gelblum and his report on these issues are irrelevant,

should be stricken and be deemed to be inadmissible at trial.

### C. Exclusion of Dr. Gelblum's Testimony and Report is additionally supported by Plaintiff's exclusion of any stroke related bills as evidence

Further, none of the nearly $90,000 in medical bills that Plaintiff intends to admit into

evidence bear any relationship to his stroke which occurred almost a year to the day after the

subject accident.  Specifically, Canoura is seeking to admit medical bills exclusively related to his

neck and back conditions caused or aggravated by the crash; to wit :

| | |
|---|---|
| Palmetto General Hospital -ER | $  1,886.00 |
| Palmetto General Hospital -ER | $12,590.54 |
| Palmetto General Hospital – Radiology | $     751.00 |
| NDAS – Dr. Suite and Dr. Williams | $14,777.50 |
| MRI Scan Center, LLC | $  1,507.10 |
| Pain Center Specialists of  FL. | $20,652.00 |
| Biscayne Plaza Surgery Center | $32,965.05 |
| AMS National LLC | $  4,500.00 |
| Total | $89,629.14 |

Canoura is not seeking recovery for medical care or medical bills incurred from his stroke

related care, by Dr. Nivea Ribas or any other physician who treated his stroke and/or his stroke

related hospitalization or work up..  This is another reason that the testimony of Dr. Gelblum and

report regarding Mr. Canoura's stroke are irrelevant and should be excluded.

**LAW OFFICES OF DIANA SANTA MARIA, P.A., University Place-Suite 205C, Ft. Lauderdale, FL 33328**
**Telephone: (954) 434-1077, Facsimile: (954) 434-4462**

WHEREFORE, for all the reasons stated above Plaintiff moves this Honorable Court for entry of an order striking Jeffrey Gelblum, M.D. as an expert for State Farm and prohibiting the admissibility of any part of his examination or report.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished by electronic mail this 1rst day of November, 2019, to counsel for Defendant at these email addresses: jonathan@bclrlaw.com; dhernandez@bclrlaw.com; and erin@bclrlaw.com.

**Law Offices of Diana Santa Maria, P.A.**
Attorneys for Plaintiff
University Place, Suite 205C
5220 South University Drive
Fort Lauderdale, Florida 33328
Telephone: (954) 434-1077 Fax: (954) 434-4462

*Diana Santa Maria*
DIANA SANTA MARIA
Florida Bar No. 473340
diana@santamarialaw.net
pleadings@santamarialaw.net

**Dougherty Law Firm**
Attorneys for Plaintiff
3333 W. Commercial Blvd, Ste 115
Ft. Lauderdale, FL 33020
Telephone: (954) 531-1821 Fax: (954)531-1823

*Adam T. Dougherty*
ADAM T. DOUGHERTY
Florida Bar No. 702609
adam@wetrycases.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
CASE No.: 1:19-cv-20883-RS

---

JUAN ANTONIO CANOURA,

       Plaintiff,

-vs-

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, a foreign
corporation,

       Defendant.

---

VIDEOTAPED DEPOSITION OF

NICHOLAS D.A. SUITE, M.D.

Taken on Behalf of the Defendant


DATE TAKEN:          August 26, 2019

TIME:              (10:00) 10:20 a.m. - 12:46 p.m.

PLACE:            11860 West State Road 84
                      Suite B-10
                      Davie, Florida  33325



Examination of the witness taken by:

CYNTHIA R. HEWLETT
Registered Professional Reporter

United Reporting, Inc.
1218 Southeast 3rd Avenue
Fort Lauderdale, Florida
954-525-2221

1   **information as to the -- what -- how the accident**

2   **played -- meaning the accident of March 26, 2016, how**

3   **it played into his condition?**

4       A     Not in an absolute fashion, but in a

5   relative fashion.

6           So we have a patient that was complaining

7   of, you know, significant worsening of the pain.  He

8   had great fear and concerns that it would never be

9   able to come back to how it was, at least in a

10  controlled state.  And so we wanted to see and give

11  him some reassurance as to whether or not there had

12  been any nerve damage underlying his prior and also

13  current symptoms.

14          So we came away feeling that this was a

15  chronic lumbar radiculopathy, something that had been

16  present prior.  Because of the demyelination, because

17  of the axonal loss, that tells us that this has been

18  something long-standing, not something that's two

19  weeks old --

20      **Q     Right.**

21      A     -- or three weeks old.

22          But what it did tell us, also, is that more

23  likely than not Mr. Canoura had an aggravation of the

24  underlying condition as a result of this March

25  accident and that's why he was so symptomatic.

Page 79

1      Q     Okay.

2      A     The nerve injuries were there.  It's shown

3  as a chronic finding.  But his symptoms were

4  essentially aggravated by the accident itself.

5      Q     Okay.  And that's -- that is obviously based

6  on the history that the patient, in this case

7  Mr. Canoura, relays to you.  True?

8      A     Yes.

9      Q     Okay.  All right.  Now, I know -- I'm now

10  going to turn you, Doctor, to the EMG studies

11  performed by Dr. Ribas.  And those were upper

12  extremity --

13      A     Yes.

14      Q     -- nerve conduction studies?

15      A     Right.

16      Q     And the upper extremity nerve conduction

17  studies were con -- let me find them, and then I'll

18  ask some questions.  I'm sorry.

19      A     Yes.

20            By the way, did you want to mark this?  It's

21  a part of the thing already.

22            MR. BORREGO:  Yes.

23            You know what, I'll mark the nerve

24      conduction studies that were performed by

25      Dr. Pena as Defendant's Exhibit Number 6 for

Page 83

1    hemorrhagic, and then went on to have a hemorrhagic

2    complication from the TPA itself.

3            And then when they did the CT angiogram,

4    they didn't really find a clot sitting there that they

5    could ascribe the symptoms to the -- of stroke that he

6    was having.  So it's a bit complicated.

7        Q    **Yeah.**

8            **First of all, did you treat him for the**

9    **stroke?**

10       A    No.

11       Q    **Okay.**

12       A    No.

13       Q    **All right.  He was obviously seen, I**

14   **believe, at Palmetto General Hospital --**

15       A    Yes.

16       Q    **-- for the -- the duration of that**

17   **admission?**

18       A    Correct.

19       Q    **Okay.  All right.  Now, the -- is it your**

20   **opinion that the stroke or the stroke-like symptoms**

21   **that he was experiencing, whether -- within a**

22   **reasonable degree of medical probability, is it your**

23   **opinion that the accident of March 26, 2016 in any way**

24   **caused this stroke that he suffered one year later**

25   **around March, 2017?**

1      A      So it's not my opinion that it caused it.

2            But I do have the opinion, within a

3      reasonable degree of medical probability, that it

4      contributed to it.  And this is based upon two things.

5            The first is that Mr. Canoura himself feels

6      that his level of stress and anxiety was elevated

7      after the 2016 car accident, to the extent that prior

8      to that accident he had been in a state of relative

9      calm in terms of his back symptoms, back problems, and

10     that he had been getting treatment every six to eight

11     months for what was a controlled back problem.

12           Then after this accident he felt as though

13     he were no longer in control, that his pain had

14     transformed in such a way that nothing was really

15     helping him.  He was beginning to see Dr. Escobar at

16     least more frequently because of the symptoms.

17           He was concerned.  He was talking about

18     electrical shocks, the pain is worse.  He said to

19     Dr. Escobar that the physical therapy that I was

20     giving him wasn't helping him, his pain was now eight

21     out of ten.  And so these are, you know, the sort of

22     concerns that were raised by him.

23           The second issue with regards to his stroke

24     etiology was really discussed with him at the time of

25     the hospitalization, according to the patient, and

Page 85

1   that was that those doctors there did their workup and

2   couldn't find a discrete cause of the stroke, like a

3   heart source or a vascular-to-vascular source or

4   anything like that.  And they told him it must be due

5   to stress.

6           So he took that and basically has focused on

7   that ever since, transmitting it to me as his major

8   concern.

9           But it's based on those two things.  One is,

10  you know, this transformation of the pain and the fear

11  that he had a -- underpinning the stress complaint,

12  and then the fact that the doctors told him that it

13  must be due to stress.

14          So for those two reasons alone I am of the

15  position, within a reasonable degree of medical

16  probability, that the stress did contribute.  The

17  stress of the accident did contribute, but did not

18  cause the condition.

19      Q    Okay.  Let me ask you, then, these

20  questions.

21          Is there any scientific -- looking at all of

22  his tests and the -- the records that you have in

23  front of you, are there any -- is there any

24  scientifically backed data that supports this opinion

25  where you can say, yes, look at this report, look at

1    stroke, the better the chance of him being able to

2    receive additional.

3           So I would just say at the time I agreed

4    totally with the cardiologist.  But I think as time

5    goes out, it all depends on how he does.  And he --

6    there may be an opportunity to give him one or two

7    doses to see if he is helped.

8        **Q      Factoring all these different moving parts**

9    **with Mr. Canoura, do you have an opinion within a**

10   **reasonable degree of medical probability as to the**

11   **future medical care that he will need to address this**

12   **exacerbation of his low back condition in particular**

13   **and, of course, the entire spine generally?**

14       A    Yes, indeed, I do.

15           And I just wanted to make the point, just on

16   a technicality from a medical standpoint.

17           We often term the permanent worsening as an

18   aggravation.  But an exacerbation usually means that

19   things flare and then go back to baseline.

20           So in this case I believe he has an

21   aggravation, not so much an exacerbation.

22       **Q      Got it.  Thank you.**

23       A    So what -- what I would say is that in terms

24   of his future care and treatment, I would predict,

25   again within a reasonable degree of medical

Page 123

1    AND FURTHER DEPONENT SAITH NAUGHT

2

3

4    _____
                SIGNATURE OF WITNESS

5

6

7

8    STATE OF FLORIDA
     BROWARD COUNTY

9
          SUBSCRIBED AND SWORN to before me this
10   day of                  , 2019, at Broward County,
     Florida.

11

12

13

14   _____
     Notary Public, State of Florida at Large
     Commission No:
15   My Commission Expires:

16

17

18

19

20

21

22

23

24

25

Page 124

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA    )
                         )
3    COUNTY OF BROWARD   )

4

5          I, Cynthia R. Hewlett, Registered

6    Professional Reporter, Notary Public, State of

7    Florida, certify that NICHOLAS D.A. SUITE, personally

8    appeared before me on the 26th day of August, 2019,

9    and was duly sworn.

10         Signed this 10th day of September, 2019.

11

12         _____

13         CYNTHIA R. HEWLETT, R.P.R.
           Notary Public, State of Florida
14         Commission No.:  GG 292478
           My commission expires:
15         March 12, 2023

16

17

18

19

20

21

22

23

24

25

United Reporting, Inc.
(954) 525-2221

Page 125

1              CERTIFICATE OF REPORTER

2    STATE OF FLORIDA  )
                       )
3    COUNTY OF BROWARD )

4

5         I, CYNTHIA R. HEWLETT, Registered Professional

6    Reporter, do hereby certify that I was authorized to

7    and did stenographically report the deposition of

8    NICHOLAS D.A. SUITE; that a review of the transcript

9    was requested; and that the foregoing transcript,

10   Pages 1 through 124, is a true record of my

11   stenographic notes.

12        I further certify that I am not a relative,

13   employee, or attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of the

15   parties' attorney or counsel connected with the

16   action, nor am I financially interested in the action.

17        Dated this 10th day of September, 2019, at Fort

18   Lauderdale, Broward County, Florida.

19

20   _____
     CYNTHIA R. HEWLETT, R.P.R.
21   Notary Public, State of Florida at Large
     Commission No.:  GG 292478
22   My commission expires:  March 12, 2023

23

24

25

United Reporting, Inc.
(954) 525-2221