IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)

JUAN ANTONIO CANOURA,                CASE NO.:  1:19-cv-20883-KMM/JB

      Plaintiff,

      v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, a foreign
corporation,

      Defendant.

_____/

## PLAINTIFF'S MOTION IN LIMINE AND SUPPORTING MEMORANDUM OF LAW

This case arises from the Defendant State Farm's failure to pay uninsured motorist policy benefits arising out of a motor vehicle collision between the Plaintiff/Insured JUAN ANTONIO CANOURA (Canoura) and Miguel Angel Cordero Illas ("negligent underinsured driver") that occurred on March 26, 2016.  On that date the negligent underinsured driver crashed into Plaintiff's vehicle causing Plaintiff serious injuries and aggravation of an underlying serious back condition including other injuries to his head, neck, back, body and limbs Plaintiff's medical bills exceed $89,000. The subject policy provides $100,000.00 in underinsured benefits.

Plaintiff moves this Honorable Court under Florida Rules of Evidence, Statutes and case law cited below, before commencement of the *voir dire* examination of the jury panel, for an Order in Limine prohibiting defense counsel and any witnesses from testifying, mentioning, directly or indirectly, regarding the matters set forth below without first approaching the bench and obtaining a ruling outside the presence and hearing of all prospective jurors or jurors ultimately selected in this cause, regarding any alleged theory of admissibility of such matters. Undersigned counsel on

1

behalf of the Plaintiff, readily acknowledges that all requests outlined below that are being made as to Defense Counsel should apply equally to Plaintiff's counsel during the trial, to ensure an orderly and efficient trial.

Plaintiff will show the Court that the matters set forth below are inadmissible for any purpose, on proper and timely objection because they have no bearing on the issues or the rights of the parties. Permitting interrogation of witnesses, comments to jurors or prospective jurors, or offers of evidence about these matters would prejudice the jury, and sustaining objections to such questions, comments or offers would not cure such prejudice but would, rather, reinforce the impact of such prejudicial matters upon the jurors.

## MEMORANDUM OF LAW AND FACTS

The following matters are not admissible for any purpose in this case:

1.      ***Fault by any non-party,*** whose negligence was not pled as an affirmative defense, as a contributing cause of Plaintiff's injuries. Plaintiff further moves to prohibit the inclusion of any non-party on the jury-verdict form and jury instructions.[1]

2.      ***Any reference to Plaintiff's Immigration status.*** The Plaintiff moves to preclude the defendant from referring to, commenting on and introducing all evidence on the plaintiff's

---

[1] In order to include a non-party on the verdict form, the negligence of the nonparty must be pled as an affirmative defense, and the nonparty must be specifically identified. Without evidence of the nonparty's negligence, the nonparty may not be received by the jury via the jury instructions or verdict form. The defendant may not rely on vicarious liability of the nonparty to establish the nonparty's fault. Notice prior to trial is necessary. Nash v. Wells Fargo Guard Services, Inc., 678 So.2d 1262, 1264 (Fla. 1996); Loureiro v. Pools by Greg. Inc., 698 So.2d 1262, 1263 (Fla. 4th DCA 1997). See also Vila v. Philip Morris, 215 So.3d 82, 85 (Fla. 3d DCA 2016) (distinguishing the "empty chair" defense from seeking an apportionment of fault).

2

immigration status. Any marginal relevance this evidence might have is far outweighed by its prejudicial effect.[2]

     3.    ***Any reference to the Defense Medical Exam of Dr. Jeff Gelblum, M.D.,*** which will be the subject of a separate Motion to Strike (incorporated herein by reference). Dr. Gelblum is the Defendant State Farm's Neurologist Medical Examiner (though Defendant State Farm also has an orthopedic medical examiner, Dr. Rolando Garcia, M.D.) and neither he nor his report will assist the trier of fact under Fed. R. Evid. 702 which governs the admissibility of expert witness testimony.[3]

On the issue or relevancy Fed. R. Evid. 401 states that evidence is relevant if: (a) it has any tendency to make a fact probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.[4]  The evidentiary rule specifically prohibits irrelevant evidence. The Advisory Committee has stated "relevance is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Federal R. Evid. 401.

---

[2] See Maldonado v. Allstate Ins. Co., 789 So. 2d 464, 469-470 (Fla. App. 2001). Even in cases where immigration status does carry some degree of weight, it poses a serious risk of unfair prejudice under § 90.403, Fla. Statutes (1993). See, e.g., Salas v. Hi-Tech Erectors, 230 P.3d 583, 587 (Wash. 2010) (holding that trial court abused its discretion by admitting probative information about a plaintiff's immigration status when doing so was outweighed by the risk of unfair prejudice).

[3] Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed. Rule Evid. 702. Essentially, the witness must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact.

[4] Sprint/United Mgmt. Co. v. Medelson, 552 U.S. 379, 388 (2008).

Defendant State Farm purports to present Dr. Gelblum's testimony and presumably his report to address legal causation between the Plaintiff's crash and his later stroke a year later. Specifically, Dr. Gelblum would testify to his opinion that there's "no plausible causation between the accident in question in 2016 and the stroke, which occurred a year later in 2017…" and that Plaintiff is "spontaneously predisposed to stroke at any time irrespective of trauma." (**See page 5 of Dr. Gelblum's report to be filed under seal**). This is an ostensible effort to refute or rebut the testimony of Plaintiff's expert neurologist, Dr. Nicholas Suite, M.D.  However, Dr. Suite was very careful to testify in his deposition that he does not believe the Plaintiff's 2016 accident caused his stroke, rather it was his opinion that Plaintiff's  preexisting spinal medical condition was *aggravated by* the crash which contributed to, *but did not cause, the Plaintiff's  stroke (See Deposition of Dr. Suite pages 78:4-79:4, 83:19-85:18 and 113:8-21 attached as Exhibit A).*  As such, the testimony of Dr. Gelblum and his report is neither relevant nor admissible and is likely to confuse the jury and adversely prejudice the Plaintiff's case by introducing other unrelated medical issues of the Plaintiff that bear no relationship with his injuries from the crash or Defendant State Farm's failure to pay the benefits owed to their insured.  Further, none of the $89,000. in medical bills the Plaintiff will be placing into evidence bear any relationship to his stroke which occurred almost a year to the day after the subject accident.

In addition, Dr. Gelblum's report and his findings are cumulative and duplicative of those of State Farm's orthopedic medical examiner, Dr. Rolando Garcia, M.D., (as discussed more fully in the Plaintiff's Motion to strike Dr. Gelblum's report and testimony filed concurrently).[5]  For

---

[5] Leffe v. Air Logistics, Inc., 876 F.2d 409, 411 (5th Cir. 1989), (personal injury case in which the trial court disallowed the testimony of plaintiff's second medical expert on the grounds that it would be repetitious and cumulative – although nor identical – to testimony already provided by plaintiff's first medial expert.)  See also Fed. R. Evid. 403. Binger v. King Pest Control, 401 So. 2d 1310 (Fla. 1981). The court stated: "We do not want to encourage attorneys from parading

those reasons and the additional grounds  presented in Plaintiff's Motion to Strike Dr. Jeff Gelblum, M.D.  and his report into evidence, Plaintiff requests that this court rule that introduction of this witness and evidence is inadmissible for any purpose in the trial.

    4.   ***Using any exhibits and witnesses or expert testimony not timely disclosed*** and/or provided as required by the Court's Trial Order[6] should be disallowed.

    5.   ***The time or circumstances under which Plaintiff employed his attorney.***[7]

    6.   ***Modifying, supplementing or changing opinions expressed by experts***. It would be inadmissible for the Court to allow any Defense expert in this case to offer opinions that modify prior opinions, reverse prior opinions or express different or new opinions from those contained in their respective reports or depositions.  To allow this to occur would constitute unfair surprise prejudice to the Plaintiff's counsel who have relied upon the written report and deposition testimony of the defense treating physicians and expert(s) in preparing for trial.[8]

------

additional experts before the court in the hope that the added testimony will improve on some element the testimony by the principal expert." Id. The court in Bowman v. General Motors Corp., 427 F. Supp. 234, 239, likewise excluded testimony of an expert, in part, under Rule 403 and noted that allowing the additional expert would only have served the (party's) "tactical advantage: in allowing a "rerun of testimony already provided by another expert…" The Eleventh Circuit has explained that "expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." United States v. Frazier, 387 F.3d 1244, 1260, 1263.  Excessive cumulative expert testimony may create a risk that a jury will resolve difference in expert opinion by "counting heads" instead of giving fair consideration to the quality and credibility of each expert's opinions. Cantu v. United States, No. CV14-00219 MMM (JCGx). 2015 WL 12743881, *8(C.D. Cal April 6, 2016) (Citing Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp., No. 10-21511-CIV, 2010 WL 4225947, *2 (S.D. Fla. Oct. 21, 2010)).
[6] Beller ex rel Beller v. U.S., 221 F.R.D. 696, 700, (Nov. 23, 2002) (new, untimely and previously undisclosed expert witness opinion excluded as prejudicial).
[7] Watson v. Builders Square, 563 So. 2d 721 (Fla. 4th DCA 1990); Martinez v. Williams, 312 S.W. 2d 742 (Tex. App. 1958).
[8] Suarez-Burgos v. Morhaim, 745 So.2d 368 (Fla. 4th DCA 1999) where defense examiner testified for the first time that plaintiff had no permanent injury as a result of the subject accident, and

7.   ***Reference to Plaintiff's counsel referral of Plaintiff to any particular physician***.

Further, Defense counsel should be restricted from making any reference on whether counsel referred the Plaintiff to a particular physician.[9]

8.   ***Evidence regarding reductions in medical bills or liens***. Defense counsel should not be allowed to introduce evidence that the Plaintiff has received any reduction in outstanding medical bills[10]; has been entitled to receive, will receive, or will become entitled to receive, benefits of any kind or character from a collateral source,[11] including but not limited to:

---

admitted that some of his conclusions were based on material he had seen just hours before testifying, plaintiff's claim of surprise and prejudice supported the granting of a renewed motion by Plaintiff for mistrial. The defense expert should not be permitted to express any opinions at trial that were not previously disclosed in their depositions. Office Depot, Inc. v. Miller, 584 So.2d 587 (Fla. 4th DCA 1991); Binger v. King Pest Control,401 So.2d 1310 (Fla. 1981); Department of Health and Rehabilitative Services v. J. B., 675 So.2d 241 (Fla. 4th DCA 1996); Garcia v. Emerson Electric Co., 677 So.2d 20 (Fla. 3rd DCA 1996); Grau v. Branham, 626 So.2d 1059 (Fla. 4th DCA 1993); Southern Bell Telephone and Telegraph Co. v. Kaminester, 400 So.2d 804 (Fla. 3rd DCA 1981); Auto Owners Insurance Co. v. Clark, 676 So.2d 3 (Fla. 4th DCA 1996). In Beller ex rel Beller v. U.S., 221 F.R.D. 696, 700, (Nov. 23, 2002), the court held that new opinions of expert economist should be excluded because (the expert's) supplemental report was submitted long after the deadline imposed by the Court and after discovery was closed. While Pfeifer argued that USA is not prejudiced as a result of the untimely expert report and is willing to open discovery to allow USA to re-depose him, that proposal does not cure the problem. Such a proposal was rejected by the court in Sylla–Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277 (8th Cir.1995), the court holding that to rule otherwise would frustrate the purpose of the new rule, which is the "elimination of unfair surprise to the opposing party and the conservation of resources." Id. at 284. See also, Aircraft Gear Corp. v. Kaman Aerospace Corp., 1995 WL 571431 at *1 (N.D. Ill. Sept.25, 1995).

[9] Burt vs. Government Employees Insurance Company, 603 So. 2d 125 (Fla. 2d DCA 1992). See also, 90.502, Fla.Stat. (1991); Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) and Worley v. Central Florida Young Men's Christian Assn, Inc., 228 So.3d. 18, 24-15 (April 13, 2017).

[10] Pursuant to Florida law, it would be reversible error to allow the Defendant to introduce the lesser amount of outstanding medical bills, rather than the gross amount billed for services rendered. Durse v. Henn, 68 So.3d 271 (Fla. 4th DCA 2011); see also Nationwide Mut. Fire Ins. Co. v. Harrell, 53 So.3d 1084 (Fla. 1st DCA 2010), reh'g denied (Feb. 11, 2011), review denied, 67 So.3d 1050 (Fla. 2011).

[11] Introducing evidence of collateral sources during the trial is reversible error.  Gormley v. GTE Products Corp., 587 So.2d  455 (Fla. 1991); Florida Statutes §768.76 (2002); Winston Towers

a)      Benefits from collateral insurance coverage;

b)      Services furnished without charge;

c)      Compensation for time not actually worked;

d)      Social Security or pensions;

e)      Any other governments or other entitlement benefits;

f)      Medicare or Medicaid benefits.

9.      ***Taxability of Award***. It would be inadmissible for defense counsel to argue that any recovery by the Plaintiff either would be subject to federal income tax or any other form of taxation.[12]

---

100 Assoc., Inc. v. DeCarlo, 481 So.2d 1261 (Fla. 3d DCA 1986) (Medicare benefits not admissible); FPIR v. Stanley, 452 So.2d 514 (Fla. 1984) (government or charitable benefits not admissible if Plaintiff incurred expense to obtain or unless "available to anyone, regardless of wealth or status"); Parker v. Hoppock, 695 So.2d 424, 427 (Fla. 4th DCA 1997), citing Eichel v. New York Cent. R. Co., 375 U.S. 253, 255 (1963); State Farm Mutual Automobile Insurance Company v. Gordon, 712 So.2d 1138 (Fla. 3d DCA 1998) (likelihood of misuse by the jury clearly outweighs the value of the social security disability benefits as evidence); State Farm Fire and Casualty Company v. Pettigrew, 884 So.2d 191, 196 (Fla. 2d DCA 2004); Nationwide Mut. Fire Ins. Co. v. Harrell, 53 So.3d 1084 (Fla. 1st DCA 2010)(evidence of discounts negotiated by plaintiff's private health insurer with health-care providers and government or charitable benefits precluded by the evidentiary portion of the collateral source rule). Under federal law, "[a]ny probative value of identities of collateral sources, such as Medicare, which paid medical expenses arising from motorist's injuries due to collision involving tractor in motorist's negligence action against tractor operator and his employer was substantially outweighed by potential for prejudice or confusion, including possibility that jurors, in determining motorist's damages, could give improper weight to inferences of reasonableness of amounts remitted from payment of expenses by government program, warranting exclusion of evidence of identity of collateral sources beyond 'insurer.'" Fed. R. Evid. 403, 28 U.S.C. App.(2006 Ed.)

[12] St. Johns River Terminal Co. v. Vaden, 190 So. 2d 40 (Fla 1st DCA 1966); Leasco, Inc. v. Barlett, 257 So. 2d 629 (Fla 4th DCA 1972). For the federal exemption *see* Internal Revenue Code, § 104(a)(2), 26 U.S.C. § 104(a)(2), and Norfolk and W. Ry. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689, *reh. denied*, 445 U.S. 972, 100 S.Ct. 1667, 64 L.Ed.2d 250 (1980).

10.     ***Improper Argument on witnesses not called.*** It would be inadmissible for defense counsel to argue that Plaintiff has not called to testify any witness equally available to both parties in this cause.  Plaintiff moves that defense counsel be instructed not to tender, read from, or refer to any *ex-parte* statement, medical record or report of any person not present in Court to testify and to be cross-examined by counsel for Plaintiff, and that defense counsel be instructed not to suggest to the jury by argument or otherwise what would have been the testimony of any witness not actually called.[13]

11.     ***Improper argument or use of evidence.*** Should defense counsel wish to introduce any exhibits, photographs or video film into evidence or the information contained in them on direct or cross examination of any witness, it is requested that the same be tendered to the Court and opposing counsel, outside of the presence of the jury, and shown or exhibited to determine its relevance and suitability for introduction into evidence prior to and before informing the jury on its existence or its tender into evidence by the Defendants.[14]

12.     ***Improper Argument or Requests before the Jury.*** Defense counsel should be instructed not to make demands or requests before the jury for matters found or contained in Plaintiff's file, which would include statements, pleadings, photographs, or other documents, nor to demand or request further or additional medical examination, physical demonstrations, or other requests during the trial and in the presence of the jury, as this would be unduly prejudicial, improper and could lead to a mis-trial.

---

[13] Texas Power E Light Co. v. Walker, 559 S.W. 2d 403 (Tex. App. 1977); Sanders v. St. Paul Fire & Marine Ins. Co., 429 S.W. 2d 516 (Tex. App. 1968).
[14] Florida Evidence Code, §90.403; Florida Evidence Code, §90.404.

13.     ***Arguing concept of "Punishment"*** The introduction of the concept of "punishment" in a civil action is so highly inflammatory as to constitute fundamental error. Defendants should be prohibited from arguing or implying that any award would constitute "punishment" to the Defendants.[15]

14.     ***Improper Argument regarding effects of verdict.*** No mention should be allowed on the effect or results of a claim, suit or judgment upon the insurance rates, premiums or charges, either generally or as particularly applied to these parties, because of this or any other matter.[16]

15.     ***Improper argument regarding Motion in Limine.*** This Motion has been presented to be ruled upon by the Court.  Plaintiff moves that defense counsel be instructed not to suggest to the jury by argument or otherwise that Plaintiff has sought to exclude from proof any matter

---

[15] Encouraging the jury to "send a message" or punish the Plaintiff by its verdict, encouraging the jury to act as the "conscience of the community," or to remedy any form of "insurance crisis." Blue Grass Shows, Inc. v. Collins, 614 So. 2d 626, 627 (Fla. 1st DCA), review denied, 624 So. 2d 264 (Fla. 1993) (finding "conscience of the community arguments" improper). Davidoff v. Segert, 551 So. 2d 1274, 1275 (Fla. 4th DCA 1989) (referring to "insurance crisis" in closing argument improper); Stokes v. Wet n' Wild, Inc., 523 So. 2d at 181 (Fla. 5th DCA 1988) (finding references to "overcrowded courtrooms" and appeals to the "conscience of the community" improper). See also, Otero v. State, 754 So.2d 765, 770 (Fla. 3d DCA 2000) (citations omitted); see also R.J. Reynolds Tobacco Co. v. Gafney, 188 So.3d 53, 57 (Fla. 4th DCA 2016) (explaining that "send a message" arguments "suggest[ ] to the jury that a significant verdict will send a message to stop [such] experiences from happening and will make others less likely to act irresponsibly" (quoting City of Orlando v. Pineiro, 66 So.3d 1064, 1070–71 (Fla. 5th DCA 2011))). That species of argument also "extends to all impassioned and prejudicial pleas intended to evoke a sense of community law through common duty and expectation." Airport Rent–A–Car, Inc. v. Lewis, 701 So.2d 893, 896 (Fla. 4th DCA 1997) (quoting Blue Grass Shows, Inc. v. Collins, 614 So.2d 626, 627 (Fla. 1st DCA 1993)).
[16] Finney v. G.C. Murphy Co., 161 A.2d 385, 387 (Pa. 1960); Wood v. N.Y. State Elec. & Gas Corp., 12 NYS 2d 947, affirmed, 24 N.E. 2d. Allstate Ins. Co., v. James, 845 F.2d 315, 318 (May 18, 1988). See article by Maurice Fixel, 148 AFTL Jour. 6.

9

bearing on issues in this cause as such behavior would be improper and unfairly prejudicial to the Plaintiff.[17]

16.    ***CRIMINAL RECORDS-(a) pertaining to Plaintiff*** Federal Rule of Evidence 609 only allows for introduction of criminal convictions not remote in time and only for crimes directly related to witness' credibility. The danger of unfair prejudice must substantially outweigh the probative value of any prior conviction. Felony convictions unless they are related to related to truthfulness such as perjury or fraud, do not address the truthfulness of a witness while their potential for prejudice is great.[18]  Evidence of extraneous crimes, remote in time, over 10-20 years ago would confuse the issues and distract the jury's focus from the central issue. Therefore, the court should disallow and exclude any such evidence that may exist.

17.    ***MEDICAL RECORDS-(b) Plaintiff's history or attributed statements regarding prior accidents contained in medical records of other treating physicians.***

---

[17] Florida Statutes Sec. 90.403; see also Texas Employers Ins. Assn. v. Phillips, 255 SW 2d. 364 (Tex. App. 1953), wherein the Court held that counsel could not argue to the jury either directly or indirectly that facts not brought out in trial, could have been proved, but for an objection by opposing counsel.

[18] Vorhol v. Nat'l R. R. Passanger Corp., 909 F.2d 1557, 1567 (7th Cir. 1990).  Fed. R. Evid. 404(b)(1) prohibits character-based inferences. Evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Fed. R. Evid. 404(b)(1).  Even if relevant for another purpose, the probative value of Canoura's unrelated crime is substantially outweighed by the danger of unfair prejudice again him in this civil matter. Fed. R. Evid. 403. "Evidence is considered unfairly prejudicial, not merely because it damages the opposing party's case, but also because its admission make it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented. United States v. Connelly, 874 F.2d 412, 418.  Trial courts are endowed with the responsibility to determine that jurors render a verdict solely on the evidence presented and the law given by the court. Banks v. State, 46 So.3d at 989, 995 (June 3, 2010); Hamilton v. State, 547 So.2d 630, 633 (Fla. 1989); Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). It is evidence and facts, not emotions or passions, that must inform a juror's decision. Matarranz v. State, 133 So.3d 473, 483-484 (Fla. 2013).

It is anticipated that Defense may attempt to introduce into evidence medical records, reports or intake information from Plaintiff's treating physicians, containing inadmissible hearsay regarding Plaintiff's alleged prior accidents as purportedly reported to some or all of his medical doctors. The Plaintiff's native language is Spanish, and he has suffered a stroke in the recent past.  Since reference to prior accidents or injuries contained in records from other treating physicians constitute inadmissible hearsay coupled with it purporting to attribute statements (inconsistent with the Plaintiff's actual past medical history) to Plaintiff, whose native language is Spanish, not English, this creates an additional risk and potential for inadmissible hearsay evidence to mislead the jury and confuse the issues[19] on the issue of medical legal causation of the client's crash related medical condition.

18. ***PRIOR UNRELATED LITIGATION*** - Evidence of other litigation is irrelevant to any issue and is therefore, inadmissible under Federal Rules of Evidence 402.  The sole purpose of bringing this type of evidence would be to show the Plaintiff's propensity for litigation and under Federal Rule of Evidence 404 (b)(1) it is not admissible to prove that a person acted in accordance with a specific character.[20] Assuming that the evidence is determined to be somehow

---

[19] In Ross Dress For Less, Inc., d/b/a Ross Department Stores, a Florida corporation v. Irene Radcliff, 751 So.2d 126 (Fla. 2nd DCA 2000) the admission of treating orthopedic surgeon's medical report, which contained inadmissible hearsay, was reversible error in personal injury action, as report addressed the determinative issue at trial, which was whether the injury to plaintiff's knee was degenerative or a result of the accident; when weighed against the testimony of defendant's two experts, who both testified that the injury was degenerative, additional opinions in report must have contributed to the verdict, and report improperly bolstered surgeon's testimony. See Bunyak v. Clyde J. Yancey & Sons Dairy, Inc., 438 So.2d 891, 893 (Fla. 2d DCA 1983) (holding that expert witnesses are prohibited from relating opinions given to them by other experts); Erwin v. Todd, 699 So.2d 275, 277–78 (Fla. 5th DCA 1997).
[20] "[A] Plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against a chronic litigant. Gastineau v. Fleet Mortgage Co., 137 F.3d 490, 496 (7th Cir. 1998).

relevant, it should still be excluded under Rule 403. The allegation central to other litigation would only serve to confuse and/or mislead the jury and unfairly prejudice the Plaintiff and would serve no legitimate purpose. Fed. R. Evid. 403.

19.   *LETTER OF PROTECTION RELATED TO THE MEDICAL CARE AND TREATMENT PROVIDED BY DR. NICHOLAS SUITE*- During the video-taped deposition of Dr. Nicholas Suite, Defendant initiated a line of questioning regarding a *Letter of Protection* ("LOP") and purported to show Dr. Suite a letter of protection purportedly pertaining to the case which was attached as Exhibit 9 to Dr. Suite's deposition. However, the LOP shown to Dr. Suite was not executed by anyone in Plaintiff's counsel's office, neither was it related to Dr. Suite's medical care and treatment of the Plaintiff. During the deposition, Plaintiff's counsel objected to the improper use of this document, arguing that by its very nature it was invalid on its face and unfairly prejudicial to the Plaintiff. During the entire line of questioning, Plaintiff's attorney, Diana Santa Maria, objected to the introduction to and improper use of this document which was not authenticated nor applicable to Dr. Suite's care and treatment of the Plaintiff:

> Q:   I have -- here, let me show you. (Exhibit 9 is shown to the witness).
>
> **MS. SANTA MARIA:  Let me just preserve an objection to this whole line of questioning.**
> But -
>
> Q: (By Mr. Borrego) Yes.
>
> A:   And I can answer, yes, after -- after you say that, that basically just to say that it's part of the packet that every patient fills out in the documents they sign when they come in.
>
> Q:   Okay.
>
> A:   Many patients are not on a letter of protection. So, I don't know if he's under a letter of protection.

Q:   I can -- okay.  Let me show you what was contained -- let me first show it to Ms. Santa Maria. The identifier is at the very bottom where it says Neurology Diagnosis & Applied Solutions.

**MS. SANTA MARIA:  I object to the use of this.  It's not a signed document from anyone in our office. And for many other reasons, which you know the case law will support, I would move to strike that and any reference to it.**

Q:   (By Mr. Borrego) I'm going to ask – once you review that document --

A:   Yes.

Q:   -- I'm going to ask you a couple of questions about it.  Okay.

A:   Yes.  Sure.  I've reviewed.

Q:   Okay.  All right.  You're familiar with letters of protection?

A:   Yes.

Q:   Okay.  Do you sometimes use them in your practice?

A:   Of course.  Yes.

Q:   Okay.  And those are basically letters of protection or arrangements wherein there is an agreement that there will be a deferred payment with regard to the medical service -- services pending the outcome of a lawsuit.  Right?

A:   Yes.  That's exactly it.  Yes.

Q:   Okay.

A:   But not depending.  Pending.

Q:   Pending.  Yes.

A:   Pending.

Q:   Yes, yes, yes. I may have misstated, but I -- I meant to say pending the outcome -

A:   Yes.

Q:   -- of a lawsuit.

Was Mr. Canoura's treatment, now reviewing that document which bears the imprimatur at the very bottom, indicating that it was sourced from your office, Neurology Diagnosis & Applied Solutions, is that an LOP that was generated by your office?

A:   Well, the form was.

Q:   Okay.

A:   But he put in his primary care doctor, which is Preferred Care Partners, Medicare --

Q:   Right.

A:   -- as being the health care provider. I'm actually not on here.  It's my form, but it looks like he's used it to set up a letter of protection with Preferred Care Providers, if you look at it, as that's how it states.

Q:   Right.

*(See Deposition of Dr. Nicholas Suite, Pages 96:22 to 99:13 attached to his deposition attached hereto as Exhibit A [Emphasis added] and Exhibit 9 to his deposition attached hereto as Exhibit B).*

Given the above testimony, this court should exclude any reference to the LOP that was attached as Exhibit 9 to Suite's deposition and prohibit questions or testimony regarding this LOP or any LOP in general.  Nor should an interrogation of witnesses, comments to jurors or prospective jurors, or offers of evidence on this issue be permitted by this court.

Wherefore for all the reasons cited, the Plaintiff requests the Court to issue and *Order In Limine* precluding the introduction, reference to or admission of the evidence outlined above.

**(CERTIFICATE OF SERVICE ON THE NEXT PAGE)**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic mail this **1rst**

**day** of **November 2019**, to counsel for Defendant at these email addresses:

jonathan@bclrlaw.com; dhernandez@bclrlaw.com; and erin@bclrlaw.com.

**LAW OFFICES OF DIANA SANTA MARIA, P.A.**
Attorneys for Plaintiff
5220 S. University Drive #205-C
Fort Lauderdale, Florida 33328
Telephone: (954) 434-1077
Fax: (954) 434-4462
Service E-mail: pleadings@santamarialaw.net

*Diana Santa Maria*
Diana Santa Maria, Esq.
Florida Bar No. 473340
diana@santamarialaw.net

**Dougherty Law Firm**
Attorneys for Plaintiff
3333 W. Commercial Blvd, Ste 115
Fort Lauderdale, FL 33020
Telephone: (954) 531-1821 Fax: (954)531-1823

*Adam T. Dougherty*
ADAM T. DOUGHERTY
Florida Bar No. 702609
adam@wetrycases.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
CASE No.: 1:19-cv-20883-RS

---

JUAN ANTONIO CANOURA,

        Plaintiff,

-vs-

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, a foreign
corporation,

        Defendant.

---

VIDEOTAPED DEPOSITION OF

NICHOLAS D.A. SUITE, M.D.

Taken on Behalf of the Defendant

DATE TAKEN:          August 26, 2019

TIME:               (10:00) 10:20 a.m. - 12:46 p.m.

PLACE:             11860 West State Road 84
                    Suite B-10
                    Davie, Florida  33325

Examination of the witness taken by:

CYNTHIA R. HEWLETT
Registered Professional Reporter

United Reporting, Inc.
1218 Southeast 3rd Avenue
Fort Lauderdale, Florida
954-525-2221

Page 78

1  **information as to the -- what -- how the accident**

2  **played -- meaning the accident of March 26, 2016, how**

3  **it played into his condition?**

4      A     Not in an absolute fashion, but in a

5  relative fashion.

6              So we have a patient that was complaining

7  of, you know, significant worsening of the pain.  He

8  had great fear and concerns that it would never be

9  able to come back to how it was, at least in a

10  controlled state.  And so we wanted to see and give

11  him some reassurance as to whether or not there had

12  been any nerve damage underlying his prior and also

13  current symptoms.

14              So we came away feeling that this was a

15  chronic lumbar radiculopathy, something that had been

16  present prior.  Because of the demyelination, because

17  of the axonal loss, that tells us that this has been

18  something long-standing, not something that's two

19  weeks old --

20      Q     **Right.**

21      A     -- or three weeks old.

22              But what it did tell us, also, is that more

23  likely than not Mr. Canoura had an aggravation of the

24  underlying condition as a result of this March

25  accident and that's why he was so symptomatic.

1     Q     Okay.

2     A     The nerve injuries were there.  It's shown

3  as a chronic finding.  But his symptoms were

4  essentially aggravated by the accident itself.

5     Q     Okay.  And that's -- that is obviously based

6  on the history that the patient, in this case

7  Mr. Canoura, relays to you.  True?

8     A     Yes.

9     Q     Okay.  All right.  Now, I know -- I'm now

10  going to turn you, Doctor, to the EMG studies

11  performed by Dr. Ribas.  And those were upper

12  extremity --

13     A     Yes.

14     Q     -- nerve conduction studies?

15     A     Right.

16     Q     And the upper extremity nerve conduction

17  studies were con -- let me find them, and then I'll

18  ask some questions.  I'm sorry.

19     A     Yes.

20           By the way, did you want to mark this?  It's

21  a part of the thing already.

22           MR. BORREGO:  Yes.

23           You know what, I'll mark the nerve

24     conduction studies that were performed by

25     Dr. Pena as Defendant's Exhibit Number 6 for

Page 83

1   hemorrhagic, and then went on to have a hemorrhagic

2   complication from the TPA itself.

3           And then when they did the CT angiogram,

4   they didn't really find a clot sitting there that they

5   could ascribe the symptoms to the -- of stroke that he

6   was having.  So it's a bit complicated.

7       Q     Yeah.

8             First of all, did you treat him for the

9   stroke?

10      A     No.

11      Q     Okay.

12      A     No.

13      Q     All right.  He was obviously seen, I

14  believe, at Palmetto General Hospital --

15      A     Yes.

16      Q     -- for the -- the duration of that

17  admission?

18      A     Correct.

19      Q     Okay.  All right.  Now, the -- is it your

20  opinion that the stroke or the stroke-like symptoms

21  that he was experiencing, whether -- within a

22  reasonable degree of medical probability, is it your

23  opinion that the accident of March 26, 2016 in any way

24  caused this stroke that he suffered one year later

25  around March, 2017?

United Reporting, Inc.
(954) 525-2221

Page 84

```
 1        A    So it's not my opinion that it caused it.
 2             But I do have the opinion, within a
 3   reasonable degree of medical probability, that it
 4   contributed to it.  And this is based upon two things.
 5             The first is that Mr. Canoura himself feels
 6   that his level of stress and anxiety was elevated
 7   after the 2016 car accident, to the extent that prior
 8   to that accident he had been in a state of relative
 9   calm in terms of his back symptoms, back problems, and
10   that he had been getting treatment every six to eight
11   months for what was a controlled back problem.
12             Then after this accident he felt as though
13   he were no longer in control, that his pain had
14   transformed in such a way that nothing was really
15   helping him.  He was beginning to see Dr. Escobar at
16   least more frequently because of the symptoms.
17             He was concerned.  He was talking about
18   electrical shocks, the pain is worse.  He said to
19   Dr. Escobar that the physical therapy that I was
20   giving him wasn't helping him, his pain was now eight
21   out of ten.  And so these are, you know, the sort of
22   concerns that were raised by him.
23             The second issue with regards to his stroke
24   etiology was really discussed with him at the time of
25   the hospitalization, according to the patient, and
```

1   that was that those doctors there did their workup and

2   couldn't find a discrete cause of the stroke, like a

3   heart source or a vascular-to-vascular source or

4   anything like that.  And they told him it must be due

5   to stress.

6          So he took that and basically has focused on

7   that ever since, transmitting it to me as his major

8   concern.

9          But it's based on those two things.  One is,

10  you know, this transformation of the pain and the fear

11  that he had a -- underpinning the stress complaint,

12  and then the fact that the doctors told him that it

13  must be due to stress.

14         So for those two reasons alone I am of the

15  position, within a reasonable degree of medical

16  probability, that the stress did contribute.  The

17  stress of the accident did contribute, but did not

18  cause the condition.

19    Q    Okay.  Let me ask you, then, these

20  questions.

21         Is there any scientific -- looking at all of

22  his tests and the -- the records that you have in

23  front of you, are there any -- is there any

24  scientifically backed data that supports this opinion

25  where you can say, yes, look at this report, look at

1   back symptoms.

2           And he came in to -- to sort of tell me

3   about the stroke again and give me updates.

4       Q    Okay.  However, from what I looked at

5   rapidly, other than having some issues with maybe some

6   memory, which obviously would be attributable perhaps

7   to the stroke --

8       A    Yes.

9       Q    -- he seemed from a neurological standpoint

10  to be otherwise more or less intact.

11          Would that be a fair statement?

12      A    Yes.

13      Q    Just as -- I know I'm summarizing it and

14  generalizing it a bit.

15          But would that be a fair statement?

16      A    Yes.

17      Q    Okay.  All right.  Let me just ask you now a

18  couple of ancillary questions, Doctor.

19          Mr. Canoura, was he seen on a letter of

20  protection?

21      A    Um, he -- he might have been.

22      Q    I have -- here, let me show you.

23          MS. SANTA MARIA:  Let me just preserve an

24      objection to this whole line of questioning.

25      But --

1     **Q**    **(By Mr. Borrego)   Yes.**

2     A    And I can answer, yes, after -- after you

3     say that, that basically just to say that it's part of

4     the packet that every patient fills out in the

5     documents that they sign when they come in.

6     **Q**    **Okay.**

7     A    Many patients are not on a letter of

8     protection.

9     So I really don't know if he's under a

10    letter of protection at this point.

11    **Q**    **I can -- okay.  Let me show you what was**

12    **contained -- let me first show it to Ms. Santa Maria.**

13    **The identifier is at the very bottom where it says**

14    **Neurology Diagnosis & Applied Solutions.**

15    MS. SANTA MARIA:  I object to the use of

16    this.  It's not a signed document from anyone in

17    our office.

18    And for many other reasons, which you know

19    the case law will support, I would move to strike

20    that and any reference to it.

21    **Q**    **(By Mr. Borrego)  I'm going to ask -- once**

22    **you review that document --**

23    A    Yes.

24    **Q**    **-- I'm going to ask you a couple of**

25    **questions about it.  Okay.**

1      A    Yes.  Sure.  I've reviewed.

2      Q    **Okay.  All right.  You're familiar with**

3  **letters of protection?**

4      A    Yes.

5      Q    **Okay.  Do you sometimes use them in your**

6  **practice?**

7      A    Of course.  Yes.

8      Q    **Okay.  And those are basically letters of**

9  **protection or arrangements wherein there is an**

10  **agreement that there will be a deferred payment with**

11  **regard to the medical service -- services pending the**

12  **outcome of a lawsuit.  Right?**

13      A    Yes.  That's exactly it.  Yes.

14      Q    **Okay.**

15      A    But not depending.  Pending.

16      Q    **Pending.  Yes.**

17      A    Pending.

18      Q    **Yes, yes, yes.**

19          **I may have misstated, but I -- I meant to**

20  **say pending the outcome --**

21      A    Yes.

22      Q    **-- of a lawsuit.**

23          **Was Mr. Canoura's treatment, now reviewing**

24  **that document which bears the imprimatur at the very**

25  **bottom, indicating that it was sourced from your**

1    office, **Neurology Diagnosis & Applied Solutions, is**

2    **that an LOP that was generated by your office?**

3         A    Well, the form was.

4         **Q    Okay.**

5         A    But he put in his primary care doctor, which

6    is Preferred Care Partners, Medicare --

7         **Q    Right.**

8         A    -- as being the health care provider.

9              I'm actually not on here.  It's my form, but

10   it looks like he's used it to set up a letter of

11   protection with Preferred Care Providers, if you look

12   at it, as that's how it states.

13        **Q    Right.**

14        A    The other thing I will tell you, is that I

15   know that when he went to Palmetto, for example, that

16   he had a CAT -- x-ray of his lumbar spine and he had

17   two CAT scans.  And if he spent more than 20 minutes

18   in that ER, his bill is probably about 20 or $30,000.

19             So any further treatment afterwards is bound

20   to be on some kind of a goodwill or letter of

21   protection type basis.

22        **Q    Okay.**

23        A    So that's just how life is.

24             I mean, the reality is that the -- the PIP

25   amount is trivial when it gets into the mar of that

Page 113

1    stroke, the better the chance of him being able to

2    receive additional.

3          So I would just say at the time I agreed

4    totally with the cardiologist.  But I think as time

5    goes out, it all depends on how he does.  And he --

6    there may be an opportunity to give him one or two

7    doses to see if he is helped.

8          **Q    Factoring all these different moving parts**

9    **with Mr. Canoura, do you have an opinion within a**

10   **reasonable degree of medical probability as to the**

11   **future medical care that he will need to address this**

12   **exacerbation of his low back condition in particular**

13   **and, of course, the entire spine generally?**

14         A    Yes, indeed, I do.

15         And I just wanted to make the point, just on

16   a technicality from a medical standpoint.

17         We often term the permanent worsening as an

18   aggravation.  But an exacerbation usually means that

19   things flare and then go back to baseline.

20         So in this case I believe he has an

21   aggravation, not so much an exacerbation.

22         **Q    Got it.  Thank you.**

23         A    So what -- what I would say is that in terms

24   of his future care and treatment, I would predict,

25   again within a reasonable degree of medical

United Reporting, Inc.
(954) 525-2221

Page 123

1    AND FURTHER DEPONENT SAITH NAUGHT

2

3

4    _____
                 SIGNATURE OF WITNESS

5

6

7

8    STATE OF FLORIDA
     BROWARD COUNTY

9

         SUBSCRIBED AND SWORN to before me this
10   day of                , 2019, at Broward County,
     Florida.

11

12

13

14   _____
     Notary Public, State of Florida at Large
     Commission No:
15   My Commission Expires:

16

17

18

19

20

21

22

23

24

25

Page 124

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA      )
                           )
 3   COUNTY OF BROWARD     )

 4

 5              I, Cynthia R. Hewlett, Registered

 6   Professional Reporter, Notary Public, State of

 7   Florida, certify that NICHOLAS D.A. SUITE, personally

 8   appeared before me on the 26th day of August, 2019,

 9   and was duly sworn.

10              Signed this 10th day of September, 2019.

11

12              _____

13              CYNTHIA R. HEWLETT, R.P.R.
                Notary Public, State of Florida
14              Commission No.:  GG 292478
                My commission expires:
15              March 12, 2023

16

17

18

19

20

21

22

23

24

25
```

United Reporting, Inc.
(954) 525-2221

Page 125

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA   )
                         )
 3    COUNTY OF BROWARD  )

 4

 5         I, CYNTHIA R. HEWLETT, Registered Professional

 6    Reporter, do hereby certify that I was authorized to

 7    and did stenographically report the deposition of

 8    NICHOLAS D.A. SUITE; that a review of the transcript

 9    was requested; and that the foregoing transcript,

10    Pages 1 through 124, is a true record of my

11    stenographic notes.

12         I further certify that I am not a relative,

13    employee, or attorney, or counsel of any of the

14    parties, nor am I a relative or employee of any of the

15    parties' attorney or counsel connected with the

16    action, nor am I financially interested in the action.

17         Dated this 10th day of September, 2019, at Fort

18    Lauderdale, Broward County, Florida.

19

20         _____
           CYNTHIA R. HEWLETT, R.P.R.
21         Notary Public, State of Florida at Large
           Commission No.:  GG 292478
22         My commission expires:  March 12, 2023

23

24

25
```

United Reporting, Inc.
(954) 525-2221

# EXHIBIT B

## LETTER OF PROTECTION

CLIENT: _Juan A. Canoura S_

ACCIDENT/INCIDENT: _3/26/2016_

HEALTH PROVIDER: Dr. Nicholas Suite

ATTORNEY: _Laura D. Dion_          PHONE: _(954)434-1077_ FAX: _____

### Protection of Outstanding Charges:
If the above named client recovers money damages from any person or entity responsible for charges incurred by the above named health provider, we agree to withhold from any check or draft in which we are an additional named payee, sufficient funds, after deduction of attorneys' fees and costs, to pay any outstanding medical bills in our possession and costs, for any and all undisputed charges owed to you in connection with the accident or event giving rise to and covered by the recovery and not covered by any collateral source.

### Amount Protected:
It is the health provider's obligation to furnish us with periodic updates of outstanding charges.

### Payment Process:
If the client is not under a letter of protection, balances must be paid within 30 days after receiving medical care.

### Approval Required:
This agreement becomes effective when Dr. Nicholas Suite and the client/patient approve it in writing in the place provided below and fax to the attorney's office.

The ultimate responsibility for charges must necessarily rest with the patient. In no way should this instrument be construed as a mean of affecting a payment contingent upon the outcome of any litigation that the patient/client is involved in.

_Juan A. Canoura S_                          _3/27/2016_
CLIENT/PATIENT                                DATE

_Prefered Care Partners (medicare)_          _3/29/2016_
HEALTH CARE PROVIDER                          DATE

_Laura D. Dion_                              _3/29/2016_
ATTORNEY                                      DATE

Neurology, Diagnosis & Applied Solutions, Inc.



EXHIBIT _9_
Deponent _Suite_
Date _8.26.19_ Rptr _LVM_
WWW.DEPOBOOK.COM